Case No. 18-7141, Ed Powell, Alliance of Artists and Recor v. Denso International America Mr. Dagan, good morning. Good morning. May it please the Court, Rick Dagan, on behalf of the Alliance of Artists and Recording Companies, I have requested to reserve four minutes for rebuttal. Do you want to move that up a little so we can hear you better? I will try to speak up, Your Honor. Because the jurisdictional issue affects only two of the six defendants in this matter, I would like to begin with the merits which have to be decided regardless and then returned to the jurisdiction. There are two errors that the District Court made. First, by finding that storage media must contain only sounds, and second, by holding that a partition cannot be a material object. It is undisputed that the devices here reproduce digital musical recordings in a digital format. In simpler terms, they copy CDs digitally. At least in terms of capability, the only issue that is before the Court on this appeal, these devices are much like personal computers, typical personal computers, and the consensus has been that personal computers are capable. They satisfy the capability requirement. Diamond, the Ninth Circuit case, which has been extensively briefed here, itself recognized that personal computers are capable of making digital audio copied recordings. The Napster decision, which has been cited, also recognizes that personal computers are capable of making digital audio copied recordings. It says that the only reason personal computers are excluded is because of the primary purpose test. The primary purpose test is not before the Court today. In fact, in Napster, the United States, represented by the Civil Division and the Copyright Office, submitted an amicus brief, which was cited by defendants here. That brief states on behalf of the government that personal computers are capable of making digital audio copied recordings. That brief is a 30-page brief dealing with the Audio Home Recording Act of 1992 exclusively. It doesn't deal with the partition issue, which is the second part of this, but it does deal with this particular issue that we're talking about. Can I ask you just how, if these devices have been made obsolete, I don't know what Spotify is, I don't know what a lot of these things are, but every time I try to talk about this device, I am told who even uses CDs anymore or who makes copies of CDs. So how big of an issue are we looking at? Well, these devices were manufactured by the defendants starting in 2008 and certainly continue to the present. So are they still being put in contact? To our knowledge, we haven't gotten discovery into that currently, but at the last time we had looked at this issue, they still were. Admittedly, these particular devices, there is a lot more streaming and other issues that is occurring, but these particular devices, at least as of the state of the record here, were continuing to be used. They were kind of the next generation of that. The owner recalls there were five CD changers that people put in their trunk. This was kind of the next iteration of that so that one could record on hard drives. It seems to me the problem for you as a district court is identifying is that, and it's a perfectly plausible reading of the statute, a digital audio recording device has to produce the digital audio copied recordings that are digital musical recordings. And your problem is you get to that last point, you really can't show that they're producing digital musical recordings in part because of the partition issue, which of course you disagree with. But I don't know how you get over the analysis. So leaving aside the partition. Let me just make one other point. One of the strong textual arguments against you is the word another in the statute. And in your brief, you ignore it. You write your brief as if another is not there. I mean, it's just it's a fatally deficient argument because that changes how you read the statute. If it says another digital music recording. Yes, Your Honor. It does say that. And we do not ignore that. We say. No, you do in your brief. We say another is aid, Your Honor. Well, but another is not aid. There's a there's an issue with respect to the plain meaning. And we we have not disputed that in the natural context, another might have the meaning that's ascribed to it by the district court. But as in in Burwell and in Eli Lilly, sometimes the plain meaning is not the actual meaning. You have to read it in the context of the entire statute. And this statute, if you look at it, there are three reasons in which I would like to go through as to why another does not have the plain meaning. Your brief starting your opening brief on page 35 starts an analysis of the word other. So you do address it. Yes, Your Honor. So the way that we address this is in three ways. First, the looking at the statute as a whole, which the court purported to do below. And we'll go through why that was wrong. But when you look at the statute as a whole, the statute structure talks about which devices are in and which aren't. It talks about a digital format that eliminated analog devices. Eliminated typical PCs, the digital musical recording definition. Make sure that no devices with a primary purpose of copying programs would be included in this. And that finally, importantly, there is an express exclusion within the definition of digital audio recording device that excludes answering machines and dictation equipment. That would have been the natural place to have a definition that excluded devices that stored more than only sounds to that device. And second, and critically, when the court decided that another should have its plain meaning in that context, it stated expressly at J.A. 236 that it was reading out in a digital recording format from the from the statute. So that immediately that calls into question whether another should have its plain meaning. Those words have meaning when the word is interpreted as a rather than another, because digital musical recording has the definition digital. So do you agree that you cannot prevail unless we buy your definition of partition or your analysis of partition? No, we think that the argument here. No, no, no. First, I mean, you know, take my question for what it is. I understand you have an argument, but you agree that we disagree with your analysis of partition. You lose. No, we win with respect to the first part. The first part is that the storage media do not have to have only sounds and they don't have to have only sound. Correct. They do not have to meet the definition of a digital musical recording. As I was just saying, we're back to the. Yes, that is. That is our primary argument, Your Honor. But secondarily, partition, which I will get to. The other thing that the district court's decision reads out, not just in a digital recording format, but it also reads out primary purpose. Primary purpose was the key in the legislative history. And in those other diamond, et cetera, that talk about how personal computers get excluded by virtue of this definition. Primary purpose is written with written out of the definition because primary purpose means there can be secondary purposes. The legislative history, for example, indicates that video cassette recorders were capable. And that's because you can copy video files onto one of these devices. If it's the primary purpose is not is to make music, it can still make video files. So it reads out secondary also back to judge Edwards. First question. All right. I understand your partition argument. So do the Second Circuit. But let me ask you about you say you can win anyway. And is that because you're looking at the language of the statute, which requires only that the reproduction be in a digital format? And that is this year. Is that the end of that? That is essentially the argument that the word a here, the word another is actually a. Let me finish on just one point. The another analysis, as I understand the way you present it, has several problems. One is that you have to look at context and how weather clauses are used in copyright in the Copyright Act. Second, you have an argument that the legislative history shows that another when the statute was amended was more or less left there. And it's sort of it's not exactly surplus size, but it doesn't take on any dramatic meaning that would upset the structure of the statute. Yes, you're right. Do you have another argument? Yes. So just to follow up on that last one, it said originally another phonorecord when the legislation was originally introduced. And phonorecord did not have the restrictive only sounds requirement. And that got moved forward. And there's no discussion anywhere in the legislative history that by that movement forward from phonorecord to audiogram, to digital musical recording that Congress meant to entirely substantial change the entire meaning of the statute. They were not intending to, in the words of the Supreme Court, put an elephant into a mouthful. And the third argument relating to that point. Actually, the third point is that this puts within the control of the defendants between manufacturers back in 1992, for example, the ability to put, for example, a picture of a cat on the storage medium. And that would disqualify these these devices. They could put a calendar on them. The defendants come back and say, but the argument you're making is contrary to the argument. I don't know if they say that you represent, but that people who are interested in having some compromise made. Essentially, as I understand them to say, you gave up on this point. Back when the statute was being developed in this compromise. No, we did not give up on this point. What do you understand? I'll ask them. But what do you understand that argument to address? The compromise was that the primary purpose test would exclude computers. The digital musical recording definition is undisputedly on the input side. They're trying to put that onto the output side. And there was clear additional clarity was gained over time to make sure that the things that were copied phonorecord. There was a fear by the computer industry that was there during this whole negotiation. There was a fear on their part that the term phonorecord could include programs. And if those were included, then primary purpose would have said, OK, could have the primary purpose of copying programs. So that's how audiogram became digital musical recording. The only time where this issue of analog. Just so I'm clear. Phono record. There was concern that this, as you say, could include programs. And that was what the defendants were concerned about. Yes, your honor, that's we addressed that in our brief at thirty three. The consumer electronics people were concerned. Sorry. That was at. In the Senate report, the computer manufacturers to reply brief at no three. There was a concern that there was no expression in phonograph that could. Phone a record that would exclude programs. And that's that's in the Senate report. So that was there. The only time another has come up at all in two occasions. Once it came up in Diamond and when the court paraphrased what that phrase meant in Diamond, it took out the another phrase and talked about that record. The Senate, when it paraphrased what it meant, it said regardless of whether that reproduction is made directly from the audiogram. So the another that those have been perfect situations where another could have been discussed. But they were not in those situations. They were totally taken out of the statute. The district court mentioned to when it cited Burwell, it talked about two cases which supported its textual reading. One was impoundment and one was immunity. Impoundment was the court simply misread that the section refers back to one zero zero two. And that is encoding that section was designed so that copyright holders could not prevent consumers from getting their copy. So it had nothing to do with the output side and the immunity section. The court used that in a very odd way because it said effectively it restricted the immunity by taking these devices out and said that was a reason to suggest that immunity supported its definition. Neither of those textual supports made any sense. If I could turn to the partition argument, if I might, and then to jurisdiction quickly. The partition argument, the court said that the plain meaning initially was a physical, tangible thing. That was fine. We agree with the plain meaning there. But then the court added extra textual definition beyond the plain meaning. Well, let me ask you, Judge LaValle for the Second Circuit writes that that's not what Congress had in mind at all. Some physical object, some wall or anything like that. So now are you disagreeing with the Second Circuit's analysis? We're willing to accept that definition for these purposes. But the first sentence sounded like you were disagreeing and you were agreeing with the district court here that it had to be some sort of physical object. In re-digi, the court said it did not have certain heft to be a material object. Judge LaValle points out, citing the Copyright Act, that that's not what Congress had in mind at all. The court there, though, found that a segment of the hard drive, which I think they were saying that did not have a lot of heft, but it is a physical material place on the hard drive. And so I think that's the sense in which we're saying it's tangible. It's not a transmission. It's not live. It is something that has some sort of substance, some sort of physical materiality to it. So we're basically agreeing with re-digi and Lindensteiner. What I didn't understand about the district court, in part, is partitions were common, known at the time Congress passed the statute. So the implication is that if Congress didn't want this to extend to partitions, it would have said something. But it didn't. It used the word any, and it had broad language and a broad purpose, subject only to very specific exceptions. So I didn't find the district court dealing with that at all, and that the district court's point was there is no physical heft here. I can't pick it up and hold it in my hand, and therefore it can't come within the meaning of the terms of the statute. Your Honor, we totally agree with that position. We think the court's description of why it did not include the rest of the Copyright Act was they just cited to a defendant's brief on that. There is no authority for saying that the Copyright Act should not be read in paramateria. So I'd like to turn... One final point on that is that the district court's decision would essentially say that a device with two hard drives, one that recorded to music and one that stored, say, maps or photos, that device would not be covered by the Audio Harm Recording Act of 1992. So in order to prevail on the petition argument, is it necessary for you to get to the primary purpose at this stage of this litigation? No, primary purpose has nothing to do with what's going on. That would be a remand that would go to the district court, and then there would be discovery with respect to primary purpose. So there is no decision that we've made here as to whether or not these devices are digital audio recording devices. The defendants will have their opportunity to say that they're not, to prove that they are actually more like typical PCs. We think discovery has already shown that these devices are nothing like typical PCs and that they do partition for music. So from your point of view, I just need to be clear about this, and I thought that's what Judge Edwards was getting at. Your point is you can win on either prong of your argument, but if you lose on one, you still win? Yes. Yes, Your Honor. And that the primary purpose argument is still to be addressed by the district court and we don't reach it? That's correct, Your Honor. And the district court approached the case this way simply because it decided to bifurcate the issues? The defendants insisted on this, and we went along. We thought that this was a very low threshold that we would meet easily, so that's the way this came to get bifurcated. If the court would like to hear about jurisdiction, I can give you a yes or a no. So the Hall case says that this court requested a briefing on this issue. The Hall court says that separate judgments, separate cases require separate judgments. There was no separate and therefore separate documents. There was no separate document here. The collective effect of the indicia here indicate that there was no separate document. There was no caption with respect to FCA. There was no document number for FCA. There was an interlocutory order. The language of the final order with respect to FCA was also interlocutory with respect to GM. It was not labeled judgment. There was a lack of a docket entry. It substantially veered from what used to be Form 32, and as the circuit court has stated on more than one occasion, the district courts are supposed to stay as close to those forms as possible. In fact, the court did hear in JA 642 the judgment that came after our 54B motion. Everyone was reasonably in doubt here, another factor that the courts had looked at. There was no clarity. The district court indicated that the appeal was timely. FCA, in its motion for abeyance, indicated that the appeal was timely and that we were all relying on a 150-day clock. Alternatively, this was premature because the Phase 1 argument with respect to FCA was still outstanding, or the entire case was merged, in which case FCA would be in the same position as Ford, and it would have required a 54B motion to bring it to the court's attention at that point to file our notice of appeal. Hopefully I'll have a few minutes left. In your view, to make sure I understand, any phono record could be a digital musical recording if you focus only on the part that has sound. Excuse me, Your Honor? Any phono record would be a digital musical recording if you focus only on the part that has sound. No, the definition for digital musical recording on the input side specifically excludes computer programs, videos, multimedia. That was the whole reason behind that definition, to make sure when you applied the primary purpose test, those things were not included on the output side. It had nothing to do with the output side. The output side can have anything on it. It just needs to be a digital audio copied recording. It can have anything on it. The concern was, let's not capture devices that primary purpose is to copy programs or videos. So by making explicit the definition of DMR, it assured that when you look through the entire statute and use the primary purpose test, devices like a typical personal computer, which copies programs, copies photos, and the recording function of that device, which is the focus of this, is not to copy music, the primary purpose. Those are excluded from being covered by the audio home program. Okay. I'm still not sure whether you need to get to the primary purpose analysis in order to be able to sustain your position or what. I mean. No, you do not need. This is this is just about capability. Capability is a very high threshold. I know. That's why I'm not sure that I'm understanding your phone record. So you keep referring to primary purpose. And that's why I asked you the question specifically. Your position is under capability, which is the only matter at issue. You can win under either of your arguments. Correct. It doesn't have anything to do with the primary purpose matter, which has yet to be determined by the district court. That's correct.  That's right. So you keep referring to primary purpose. And that's I think it's confusing. Right. In terms of capability, the any machine that copies phone records would be capable, if that's what your honor is asking. That that would satisfy the capability requirement. Then when we go on and figure out, does it satisfy the primary purpose requirement to figure out whether it is copying DMRs, whether it is copying things with programs, is that. And we're not getting to any of that. We don't have to get into the primary purpose. This is not just about capability. Use those words because that makes us think you're relying on primary purpose. The only reason I'm mentioning primary purpose is to explain what the actual bargain was, what the computer industry wanted. And that's how that's how it was effectuated. That has nothing to do with the question before the court. All right. We'll give you a couple minutes. Thank you. Mr. Keller. May it please the Court. Scott Keller for the FBI leads. The plaintiff is trying to rewrite this act. And you just heard from them. What they want to do is reinsert the term phonorecord back into the statute when Congress made a specific term just for this act, which is digital musical recording. In fairness, I can take your argument. But counsel will respond to the court's question about phonorecords. That's right, Judge Rogers. I mean, the blue brief is very clear. We're beyond that because of the amendment in the statute. Well, but I don't think we're beyond that. And the reason why is for two reasons, that they are trying to read this back into the statute. And it's the same textual missteps they're making. First, they would read the word another right out of the statute. You heard from them. No, no, no, no. Let me just be clear. Let's not argue what they're not arguing. All right. That's not what they said. But I just want to be clear. When you look at Section 101, 1A, there's only one requirement there. So to take it through, there are three intricate, nested definitions here. Okay. Do you agree about 1A, that a digital audio copy recording is simply a reproduction in a digital recording format? Of a digital musical recording. Right. Whether that reproduction is made directly from another digital musical recording or indirectly from a transmission. Right. So how do you respond to the whole point that the Copyright Act uses whether clauses not as ultimate limitations but as descriptive exemplars? For example, it doesn't matter where it comes from. The point is, if a reproduction comes out in a digital form, then it meets the statutory definition. That's their argument in part. Yeah. Their argument in part about the weather clause is that that is what it does. But this is not just a non-exhaustive list. The Ninth Circuit in Diamond identified saying these are the two means of identifying district court. But this question wasn't before the Ninth Circuit, remember. It was dealing with inputs, not outputs. So I want to focus on the whole point. Do you deny that the Copyright Act uses whether clauses in the manner they describe? Yes, we do deny that. All right. So give me an example of where it doesn't. Sure. Well, in the definition of digital audio recording device in the statute, section 1001.3, the whether clause there does. Additionally, we would cite 1006.B.1. Well, let's look at 3. All right. A digital audio recording device is any machine or device. Blah, blah, blah. All right. Except for, and then it's very specific, not what's excluded. But earlier it says whether or not included with or as part of some other machine or device. When whether is being used in 1001 and 1006, 1007 and 1010, it's not being used as a such-as clause. If I can return to the two. But come back to me to this language that you're focusing on, because I want to be clear. You're saying that in 3, when the statute talks about a device as any machine or device, and then it comes down to say whether or not included with or as part of some other machine or device, that that's a limitation as opposed to just an elaboration of what any encompasses? This is responding to their argument about how whether you're using the Copyright Act. The overarching structure of the statute was you had the definition of what is a covered recording device, and that necessarily referred to what is a digital audio copied recording, which also in turn necessarily refers to what is a digital musical recording. And what they're trying to do in the definition of digital audio copied recording is read the word another right out of the statute. And we don't rely only on another. I think you could decide just on that. But also Section 1008, the immunity provision, that also refers to devices, the covered devices that are making digital musical recordings. In other words, the output must also be a digital musical recording. It's a material object with only sounds. The actual remedial provisions in 1009 similarly provide that. So we have three different – Well, you're talking quickly, but – And I'd be happy to go through these individually. I understand that. That's why I want to – I don't want to go too fast here. They're not really – I'm sorry. I'm looking at 1008. All right? We're talking about prohibition on certain infringement actions? Yes, Your Honor. And it's talking about what kind of action can be brought? Yes. And how does this help your argument? It helps because of the language making digital musical recordings. This is a provision that refers to immunity for certain copyright actions in this act. And it says that when there's non-commercial use – this is the final clause of the provision – when non-commercial use by a consumer of such a device or medium for making digital musical recordings, that's when the immunity kicks in. Well, making digital musical recording is the output. That means that digital audio copy recordings had to also be digital musical recordings. This act was concerned about, is the output today going to become the input that is being copied tomorrow? So if I record a CD and I put it on a hard drive, you understand that if that's all – a musical CD – if that's all that's on the hard drive, then you're covered by the act. Under your honors hypothetical, yes. But that would assume there aren't computer programs that could have transferred that into the typical computer. A computer hard drive is not going to operate just in that way. Stay with me on a simple case, though. Sure. So I copy a CD onto a hard drive, and the only thing on the CD in the hard drive is music. That's covered, right? Yes, under your honors hypothetical, if there are only sounds on a material object, then that would qualify as a digital musical recording. So then how does 108 help you? Well, because the issue that is – In other words, what I'm getting at is the hard drive itself, are you arguing that that has to be able to make reproductions itself? The hard drive has to be a material object with only sounds. I understand, but it doesn't have to be a device that can reproduce. That's what I'm trying to say. Well, the recording device has to be able to reproduce a digital musical recording. Well, so I can listen to it, but it doesn't – I thought the whole point here was the manufacturers, etc., were concerned about these serial copyings, all right? And that was what this act was supposed to stop. But it's okay if I make a musical CD and I copy it onto a hard drive. Well, our position is that would not be excluded – that would be excluded from the act because there would be all sorts of other things on the hard drive. No, no, no. My hypothetical is all that's on the CD and all that's on the hard drive is music. That's covered. I thought you agreed. Yes, because it would be a material object with only sounds. That's not this case, but our hypothetical. So you agree. And the hard drive itself does not have to be capable of making reproduction. I thought that was the whole point. Yes, Your Honor. I can listen to the hard drive, but I can't make serial copies. Judge Rogers, that's correct. What has to happen, there has to be an input and an output that are both material objects with only sounds. So, since partitions were common in existence at the time Congress acted, and Congress knew, was deemed to know, that a hard drive could contain a number of things – music, lectures, photos. And it didn't say that means that you're exempt. It is excluded. Congress specifically was intending not to include typical computer hard drives. The Ninth Circuit said, quote, there are simply no grounds in either the plain language of the definition or in the legislative history for interpreting the Act to include songs fixed on computer hard drives. In the sense that it's got more than music on it. I'm still back on hard drive with only music. And the Act says it's okay to have some instructional, et cetera. What I don't understand about your argument, and help me here, is Congress knew that hard drives had petitions on them. So when I have a hard drive, I've got photographs on it, I've got a lecture on it, and I've got music. And I can play only that music because of the way the technology works. The petition is a distinct technological file, as it were. But it's all on this hard drive. And I don't understand why Congress uses words like any, any machine or device. It doesn't mean that as well. Why would Congress ignore something that's out there and is in, you know, frequent use? Well, because, Your Honor, we're talking about the device part of the definition. The material object is within the third level nested definition of digital musical recording. And when it was referring to a material object, it was a material object with only sounds. There's no limiting principle. Where does it say that? In section 1015, a digital musical recording is a material object in which are fixed in a digital recording format, only sounds. Okay, but a material, but let me find 105. 1005. All right. And it says a material object in which are fixed in digital recording format, only sounds and materials, statements or instructions, incidental, if any. And it goes on. And then it says, but it doesn't include, and it lists the things that are excluded. Yes. It doesn't say anything about if you have this separate file. And this is why there's no limiting principle. If you can just identify any single file, anything, smart phones are covered, tablets are covered, iPods are covered, millions of devices are covered that when billions of dollars have been spent in the industry making those devices. But the floodgates argument goes your way, too. You can just add some data to the flash drive and you're set. Well, the part of this is this is the act Congress designed. Remember, in 1992, the typical digital audio copied recordings of the time were CDs, digital audio tapes. Congress predicted mini-discs would be there. These are easily distributable, removable devices that a college roommate could hand to his or her roommate to pass around audio. That was the narrow grand compromise struck here. And this definition of digital musical recording, this is what replaced phonorecord. And there's a key distinction between the two terms. Phonorecord is a material object with any sound. It could have other things on it. That's how that's being used in Redigi and Lund and Sire. Here, though, Congress made a specific term that was a material object with only sounds. And if a plaintiff can come into court and manipulate the level of generality of what material object is, it can sweep in anything that has any digital audio. Do you have anything in the legislative history that supports that argument about material objects? Yes. Where? First of all, the Senate report at page 46 identified the types of easily distributed objects of CDs, digital audio tapes, digital compact cassettes, and mini-discs. The Senate report at 35 to 36 and the House report at 17 said digital musical recording was being inserted into this act because broader terms might inadvertently encompass technology like computers. So let me be clear. Senate report 45 and what were the other pages you gave me? The Senate report at 46 lists the CDs and digital audio tapes. And then the Senate report at 35 to 36 and the House report at 17 referred to the fact that phonorecord was overly broad. So that's why Congress added these exclusions. Yes. It changed the definition for phonorecord to digital musical recording. It also added the computer program exclusion. And in the context of what was happening here, the computer industry came in halfway through the game. And that's why the statute was changed. And what plaintiffs are trying to do is go back to that beginning and try to reinsert phonorecord into the statute. Well, I don't know about they didn't get into this until halfway through the game, counsel, with all due respect. Well, the original bill here covered phonorecords. And Diamond made this point, too, that the computer industry would have vigorously opposed this act if it had covered all digital copying devices. That's 183 F3 to 1077 and 1086 note 6. And if I can also address the idea about Because they were concerned about college kids just copying, copying, copying, copying. Serial copying. Yes, but the act didn't ban or put royalties on all serial copying. Rather, it targeted a narrow set of devices, devices that would have an input with material objects with only sounds and an output of material objects with only sounds. Those would be CDs, digital audio tapes, mini discs and the like. But Congress knew that hard drives can contain more. It did, and it expressly designed this act not to include them. Now, the Copyright Act's other protections could still apply. The act that isn't excluded is covered. If that's what I'm trying to get you to help me on. Oh, no, no, no. Everything that would be excluded from this act, the Copyrights Act, other general provisions would apply. This act was a technology-based, unlike the conduct-based rules that we typically have throughout the rest of the Copyright Act. Well, I thought the legislative history said this is not supposed to be focused on what technology is involved. Well, no, it absolutely was. In fact, Congress specifically excluded technology with computer programs on it. So Congress knew about that. It excluded specifically these things in B in 5. I understand that, but it didn't exclude partitions. No, so at the time that this act was being drafted and passed, partitions, it was well aware that partitions were there. And if you would take this partition theory to its logical consequence, then putting the digital musical recording definition of a material object with only sounds, that would have no limitation at all. Well, it would, because Congress has these exceptions. No, it wouldn't, because what they're trying to do, and this is key, is they're trying to say a digital musical recording, yes, okay, maybe it's a material object with only sounds, but we're going to identify the material object at such a low level of granularity that if we point to a single file on a hard drive, and by the way, a partition is not a separate, removable, distributable part of a hard drive. The entire hard drive has to be operating to actually perceive all the partition data. And even then, a partition is just an imaginary line. I know, but you and I both know. I mean, you can play a recording and you can go to the part of the recording you want to listen to. Yes, but at the same time, their test would be is there something that's specific and well-defined. Well, a single song on a CD would be a specific, defined file. A single file on a computer would be a specific file. All of a sudden, if every time you have a recorded audio file on your smartphone, that smartphone is now a recording device that would have $2,500 per device in statutory damages, that would sweep in all sorts of technology that this industry has spent billions of dollars, that even the recording industry itself in 2006, in the brief from them that we cite in our brief, provided. Let me ask you one thing. I just want to make sure I'm figuring out what both sides are saying. I think your principal argument, as I understand it, look, the bottom line is we get phonorecords out of there. They use a different term. The bottom line is digital audio recording device must produce digital audio copy recordings that are digital musical recordings. The problem for them is digital musical recordings is a very specific concept, and it excludes certain situations, sounds, et cetera. That's why they're running, here's my view of their position, that's why they're running to the partition argument to escape what you perceive to be the powerful argument there. They're trying so hard to avoid the requirement of digital musical recordings, because that itself doesn't mean anything. It's only when you look at the definition of digital musical recordings, which means it can be sound only, they're in trouble. And the partition argument is a way to try and take themselves out of trouble. Is that what you're saying? Yes, that's exactly right, Judge Edwards. And this is a novel theory, the idea that somehow parts of material objects, especially when it would be an imaginary line, and the district court's example of two roommates in a room was an apt analogy. Oh, but it wasn't. That's the whole point, all right? The district court's analogy doesn't fit what we're talking about here. And that's why the district court didn't deal with it. That's what I'm getting at. You may be right, ultimately, but the district court has to deal with it. Well, the district court was dealing with it in the sense of identifying what is the scope of this statute. When a partition has no existence separate from the hard drive, it is just the location on the hard drive where data is stored. That doesn't somehow transform just the partition into its own material object. And even the district court acknowledged a partitioned hard drive is still one physical disk. We're talking about one platter with one span. But that's because he had this concept. It has to be something I can hold in my hand. It has physical heft in this whole area. You know, we're talking about moving music and other things from one place to another. There's no physical heft involved. Well, but in the context of this act, Your Honor, I think it does, because this act was targeted with is it a distributable, removable object that could easily be passed to someone else, a CD, a digital audio tape, a mini disk. That's why exactly the term was created to have a digital musical recording as an output. There's a material object with only sounds. You can't just give the hard drive in the middle of a dashboard of a car to a friend and to somehow have a lot of copies of music passed that way. These are integrated components within cars that have navigation data. They have software for backup cameras. They operate the radio. They have voice recognition commands. This is a multifunctional computer. It's not a typical personal computer, but it absolutely is a hard drive that has multifunctions, and that's precisely what Congress intended to exclude in this act. And if it was a non-multifunctional receiver, then what? You conceded that already. If it were simply a material object with only sounds, if you could imagine a hypothetical, and I'm not sure there are any hard drives like this. I understand. I'm just, again, just making sure I understand your argument. You're conceding that if it's a drive devoted to sound and music, then you're in trouble. Yes, assuming there are other programs on it. Yeah, I'm saying devoted. But why would Congress do that when it knew there weren't such hard drives? That's my point, that they have all sorts of other things on them. So it doesn't make sense to define it this way. No, it doesn't. Well, I think your answer is that's the compromise. Yes, that is the compromise. They don't want to go after people who are in this situation, and we're assuming maybe there are copyright things you can get them for, but we're assuming they're doing it for their enjoyment. They're not producing stuff to sell. I mean, I thought that was the compromise. Absolutely, Judge Edwards.  But I would like to point out, Your Honor, the definition of digital audio copied recording that we're arguing about, that goes both to the capability and the primary purpose problems, because both of those are tethered to that digital audio copied recording.  that's going to be able to do that. that you have here is not going to affect the primary purpose problem. It absolutely will. This is a two-pronged conjunctive test. Also, it's not like the statute was drafted to sweep in all digital audio and then have an exception based on primary purpose. No, the statute had two different prongs, and they were both tethered to these interlocking three definitions. And if I could also briefly address Diamond. Could I just ask you, in your brief, you argue that the interest that the appellants represent took a different position at the time of the compromise, and I asked the appellant's attorney about that. What did you have in mind? Well, at the time, the grand compromise here was to ensure that computers and computer hard drives wouldn't be covered. So we're all agreed on that. Okay. The question is, you say in your brief, the argument that appellants are making now on behalf of their clients is contrary to the arguments that were made by whoever it was by people representing the types of interests they represent now. Yes, their partition theory would sweep in hard drives. It would sweep in smartphones and iPods. There would be no compromise. And in the context here, this was supposed to be an act that was targeted at these narrow devices to avoid years of litigation like the cellular beta mass video recording technology. Congress didn't want that year's worth of litigation to be repeated about digital audio tape recorders. But their partition theory would sweep so much further than digital audio tape recorders. So what did they argue? I just need to be clear what your argument is. Their argument at the time the act was passed So if Your Honor is referring to what the grand compromise was... No, I'm referring to your brief that says that the argument they make now... I understand, Your Honor. In 2006, the recording industry, and the recording industry has members sitting on plaintiff's board of directors, they made the argument that is exactly the argument we're making today, which is you cannot read another out of the statute, the output must be a material object with only sounds, and devices that have audio stored on computer-like memory, which is exactly what we have here, those are not included by this act. That was the recording industry's position in 2006, and today they have completely flooded that. Can you just say that last phrase again? Absolutely. In 2006, the recording industry took the position which is the position we are espousing today. The output must be a material object with only sounds, because you cannot read another out of the statute, and two, the consequence of that is audio files that are stored on computer-like memory. Those are excluded by the act. That's exactly why our device is excluded by the act. If Your Honors would briefly like me to address jurisdiction, I would be happy to. Thank you. I think we've got time. If there are no further questions, we ask that you affirm the district court's thorough analysis to create a summary judgment to all defendants. Thank you. Why don't you take two minutes? Counsel, needless to say, I would like you to argue the response to two points made, and that your petition theory means there are no limitations whatsoever. So with respect to the XM case, that argument was made by a party that was not us. This is the Alliance of Artists and Recording Companies that is present here. And more importantly, that argument lost. And that is reflected in the XM decision in their footnote four. That argument lost. It was briefed, and it lost. So if anything comes out of the XM case, that that argument is a loser. Diamond says the same thing, that these things are capable. Napster says the same thing. And the amicus says the same thing, as well as the legislative history. Recall that video cassette recorders themselves under the legislative history are capable. One point, I'd like to go through some of the points that they made. Was there a second one? Yes, the second point was if we were to agree with your limiting principle, that would just bring in the kitchen sink. So in this case, the court itself indicated that hard drives, that partitions were essentially like hard drives. They were functionally equivalent. The court said it was a defined space. The court doesn't need to go any further than to say that these, what was previously said, that hard drives are material objects and say that the equivalent of a hard drive is a material object. In Aereo, for example, the court said it looks like a cable system. We're going to treat it like a cable system. And you don't need to go, as also said in Aereo, you don't need to go further than that in this case. In addition, the notion that everything else would be swept in as a result of this, again, going back to the primary purpose. If something records files to a partition and its primary purpose is not to do that recording, then it would not sweep in anything in that regard. So that issue about bringing in the kitchen sink has yet to be decided. That's what your argument was. It has not been decided. And in fact, we've seen over the years, computers have not been, there have been no lawsuits against computers. So the concern about cars, including hard drives and other objects, material objects that have all kinds of other things on them, GPS, et cetera. We don't know at this point whether the district court would agree with you or with the defendants in terms of whether that's compatible with the primary purpose. Correct, Your Honor. So just in terms of the purpose of the statute, there's been discussion that they said that the primary purpose was this serial copying issue. That leaves out the other purpose of the statute, which was to provide compensation from the first copy. There was an earlier version of the statute which only involved serial copying. That was rejected by the music industry. They require, as the Copyright Office said, the music industry is hurt by every individual making that first copy. It's not just about whether or not these devices can copy out. It's about whether they make a copy. And they can also be prevented from making copies of copies. So that is wrong. In terms of the immunity argument again, the district court recognized that the statutory purpose here was to ensure that consumers had the ability to make digital audio recordings. And then it interpreted, used the immunity section to shrink that immunity and kick these devices out. In terms of the repeated statements that this was a narrow, narrow statement of that, the Congress wanted something narrow. Congress said on multiple occasions this was to keep pace with the rapidly changing technological world. And they said also that it was to encompass all devices current or made in the future. So that argument does not does not have any ability here. If I could just wrap up with 30 seconds, Your Honor, if I might. In summary, one of ours main purposes was to prevent the battle between copyright holders suing manufacturers and then there being a fight over fair use. That's what the intent of this statute was. The decision here leads exactly in that direction toward more copyright infringement action, which defeats the whole purpose. Reversal on the first point will implement that statutory purpose and avoid additional litigation with respect to partition. Should the court disagree on that point and then reversal is still appropriate because a partition is a material object. And as we stated, the jurisdictional issue, the FDA appeal was timely because there was no separate document. Thank you.
judges: Henderson, Rogers, Edwards